[No. 1869-2. Division Two. November 15, 1976.]

TERRY BRINK, INC., *Respondent*, v. EVELYN M. AIRHEART, *Appellant*.

*Brooks K. Johnson* and *Johnson & Johnson*, for appellant.

*M. B. Rees* and *McCormick, Hoffman, Rees & Arnold,* for respondent.

REED, J.—Evelyn M. Airheart appeals from a judgment in favor of the real estate brokerage firm of Terry Brink, Inc., (Brink). The brokerage firm sued Mrs. Airheart to recover a commission allegedly owing under an exclusive listing agreement which had expired at the time the sale of the subject property was consummated by the owner, Mrs. Airheart. The trial court, sitting without a jury, held that the defendant breached the exclusive listing agreement and a subsequent listing cancellation agreement by selling the property to a buyer who had contacted her before and during the exclusive listing period. We disagree that a breach occurred and reverse the judgment.

The facts are not disputed. Evelyn Airheart, a widow living in Tacoma, owned a parcel of land in rural Pierce County. She has had some experience in buying and selling real property. In 1970, she erected a "For Sale" sign on the subject property. A Mr. Leo Ceccanti called her in 1973 and was quoted an asking price of $75,000 with $20,000 down. On December 13, 1973, following a call from a Brink salesman, Mrs. Airheart entered into an agreement with Brink, giving the firm the exclusive right to sell the property for 180 days. The listing price was $85,000, as she wanted to "net" at least $75,000 after Brink's 10 percent commission and expenses of sale. She did not tell Brink about Ceccanti's call or any other previous inquiries concerning the property.

The agreement provides, in pertinent part, as follows:

> In consideration of the services of TERRY BRINK, INC., REALTOR, hereinafter referred to as "Broker" to sell the following described property, you are hereby appointed exclusive agents with the exclusive right against all others, including myself/ourselves, to sell or trade said property according to the terms herein stated, or any modification of the same which I/we may hereafter accept for a period of one hundred eighty (180) days from the above date.
>
> I/we further agree that in the event that *a sale is effected or purchaser found* by myself or other, *who is able, ready, and willing to buy said property,* to deliver to said purchaser through Broker, a warranty deed, or

real estate contract with a policy of title insurance show-ing marketable title. Broker is authorized to charge from the proceeds of said *sale made during the term of this agreement* a commission of ten percent (10%) of the sale price.

   Should a sale be pending at the date of the termination of this agreement, or should a sale be effected within four (4) months of the expiration of this agreement to anyone to whom the Broker, his agent or the agent of any member of Multiple Listing Service of the Tacoma Board of Realtors had shown or brought in contact with the property, this agreement shall extend to cover such sale.

(Italics ours.)

Mr. Terry Brink mentioned the property to a few regular customers and showed it once or twice but did not advertise it or incur any direct expenses in connection with the listing. In early February 1974, Mrs. Airheart asked for a cancellation of the listing because she intended to marry a man who was interested in raising chickens on the property. Consequently, the parties on February 13 signed a "Listing Cancellation Agreement" supplied by Brink, which canceled the listing and went on to provide:

   It is understood that if any sale of this property is made by me or anyone else during the effective dates of the original listing that the terms of the original listing shall apply. Further, if I should decide to place described property on the market, I will give TERRY BRINK, INC., REALTORS, first option to list my property.

Following the cancellation, Mrs. Airheart took down the "For Sale" sign and prepared to move onto the property. In April 1974 Mrs. Airheart encountered Mr. Ceccanti at a business establishment in Tacoma; according to her, their meeting was entirely coincidental. Mr. Ceccanti had observed the sign was down, and he inquired about the property. Mrs. Airheart told him she was considering raising chickens there. She did not say it was for sale and no terms were discussed. Mrs. Airheart and Mr. Ceccanti met again in May with her attorney, who told them the agreement precluded a sale of the property. She testified she "wasn't particularly interested in selling" anyway. Nevertheless, on

June 18, 1974—after expiration of the exclusive listing period—Mr. Ceccanti called her and she agreed to sell the property for $75,000. She said she changed her mind about moving onto the property and decided on June 18 to sell it because of the poor health of a sister who resided with her.

Brink then sued to recover its commission under the listing agreement and was awarded $7,500, although it never had any contact with Mr. Ceccanti. The court disbelieved Mrs. Airheart's testimony and found that she decided to sell the property prior to the end of the exclusive listing period. The crux of this appeal, therefore, is whether Mrs. Airheart's *decision to sell* the property to Mr. Ceccanti during the listing period places her in violation of the agreements. We think it does not.

The listing agreement designated Brink the exclusive sales agency for 180 days. The cancellation agreement signed on February 13 had the effect, by its terms, of voiding the listing agreement except: (1) "if any *sale* of this property is made . . . during the effective dates of the original listing," (Italics ours.); or (2) if defendant "should decide to place described property on the market," in which event Brink would have first option to list it.

The first of these exceptions is not applicable. No matter how many conversations the defendant and her ultimate buyer had, and no matter what her secret intention may have been, the fact is that no sale was effected during the listing period. No money changed hands, no agreements were signed, and no documents were transferred. Absent a writing in proper form, Mr. Ceccanti could have had no enforceable agreement with Mrs. Airheart to purchase real property.

Moreover, the cancellation form refers to the original listing, in which Brink was entitled to a commission if "a sale is effected or purchaser found." This language distinguishes between a sale and the act of finding a purchaser. Yet this distinction is not preserved in the subsequent cancellation, which retains only the word "sale" and thereby creates an ambiguity as to whether the parties

intended that the preliminary act of finding a purchaser would activate the commission. Ambiguities in a contract are construed against the drafter. *Wilkins v. Grays Harbor Community Hosp.*, 71 Wn.2d 178, 427 P.2d 716 (1967). If Brink intended to bind Mrs. Airheart beyond the cancellation date to payment of a commission upon the appearance of an able, willing purchaser, it could easily have so provided in the cancellation form. Instead, the word "sale" was repeated while the "purchaser found" language was dropped. Accepting the court's findings that the defendant decided before the expiration date to sell the property to Ceccanti, and that he was a willing and able purchaser, this did not amount to a "sale" under the cancellation agreement so as to invoke the commission clause of the exclusive listing. *See Thayer v. Damiano*, 9 Wn. App. 207, 511 P.2d 84 (1973).

Brink urges Mrs. Airheart also breached the cancellation agreement by deciding prior to June 13, 1974, to place her parcel "on the market" and not giving Brink the first option to list it. This provision begins with the word "further" and immediately follows the sentence stating that the original listing shall apply in the event of a sale within the listing dates. We agree with the defendant that the reasonable interpretation of this provision is that the first option also was intended to pertain during the effective dates of the original listing, and not indefinitely.

It was the trial court's prerogative to disbelieve Mrs. Airheart and to find that she determined during the 180-day original exclusive listing period to sell to Mr. Ceccanti. We do not agree, however, that this decision constituted placing the property on the market. Her decision to sell to Mr. Ceccanti was evidently a result of his persistence. He questioned her in April after seeing the sign had been removed. She denied any intention to sell the parcel or that they discussed terms of sale at that time. She said Mr. Ceccanti was interested in the property when they visited her attorney, but she denied making any decision to sell in May. There is no evidence that Mrs. Airheart advertised

the property for sale or attempted to locate buyers following cancellation of the listing, or that she induced Mr. Ceccanti to make the purchase.

Words used in a contract must be given their ordinary meaning unless a different meaning is clearly intended. *Wasser & Winters Co. v. Jefferson County*, 84 Wn.2d 597, 528 P.2d 471 (1974). To "place on the market" connotes an offering to the public at large, or to a group or class of prospective purchasers. The testimony here indicates that Mrs. Airheart was not the aggressor in dealing with her buyer, but ultimately responded to his inquiries by agreeing to sell. Despite the trial court's finding that she made up her mind prior to expiration of the original listing period, we do not believe that the defendant ever placed her property "on the market" in the commonly understood meaning of that phrase.

We are convinced that Brink was not entitled to a commission when the defendant sold her property. Brink had no part in the sale and, indeed, did practically nothing to earn a commission. *See Lloyd Hammerstad, Inc. v. Saunders*, 6 Wn. App. 633, 495 P.2d 349, 51 A.L.R.3d 1145 (1972). More to the point, Mrs. Airheart's activities did not contractually qualify Brink for a commission under the exclusive listing agreement or the cancellation agreement.

Having held that the defendant did not breach the agreements, we need not consider the proper measure of damages for such a breach.

The judgment is reversed.

PETRIE, C.J., and HENRY, J. Pro Tem., concur.